Good morning, and may it please the Court. My name is Toji Colabro. I represent the plaintiffs and the appellants in this case, and I would like to reserve five minutes of my time for rebuttal. The question before the Court is whether the District Court faithfully and impartially applied controlling law to the evidence and the allegations in this case. The short answer is no, and we ask this Court to vacate summary judgment for defendants, reverse the District Court's discovery orders, and remand for full discovery on the merits with a different District Court judge. As we set forth in our briefs, we have organized our analysis into three main areas. Number one, even on the factual record before it, the District Court wrongly concluded that the generic language in the transaction documents excluded liability for defendants. Second, even if there wasn't sufficient evidence to defeat defendants' motion for summary judgment on the record before it, the District Court erred in refusing to allow additional discovery before deciding the motion. And third, the District Court also erred in granting summary judgment to defendants on the merits of plaintiffs' claims in contravention of controlling law, when defendants did not even move for summary judgment on the merits. Subject to further questioning from the panel, I'll take each of those in turn. First, with respect to the transaction documents, as an initial matter, it's important to note that it's undisputed the transaction documents do not release claims that occurred after the transaction documents were signed. So the claims regarding fraudulent pricing, the tortious conduct to destroy plaintiffs' businesses, all of those cannot be released under the transaction documents, and this alone is sufficient reason to vacate summary judgment for defendants. Moreover, with respect to the transaction documents and the misrepresentations we allege, it's of course black-letter law that releases procured by fraud are unenforceable, and that you can't, by disclaimer or otherwise, exclude liability for fraud in inducing a contract. We set forth five representations that we contend are misrepresentations and are verifiably false. First, we set forth that Saevolat's representation, that they have experienced 40 years of consecutive growth, is verifiably false. We set forth in the record several ways in which it's verifiably false, and on summary judgment, defendants have failed to present any evidence of any way, of any interpretation, that it's true. Where was that representation made, and to whom was it made? The 40 years of consecutive growth was throughout on the website of Saevolat, and it was there for years. So it wasn't something made specifically to your client in the context of negotiations? Well, it serves as a foundation, right? I mean, there's evidence in the record that the plaintiffs reviewed the Saevolat representation. They looked at the website. I'm sorry? They looked at the website. Of course they looked at the website, yes, and that's in the record. That's a public-facing website, not an internal website made available to potential licensees only. Correct, Your Honor, but it's important to note that there's evidence in the record that that specific section of the website was designed to attract owner-operators like the plaintiffs. Our plaintiffs in particular were specifically targeted as people that they wanted to induce additional investments from. So that's 40 consecutive years of growth, which is verifiably false. Second, there was the representation that Saevolat had a hard discount, was a hard discount grocer. This was in the LSAs. It was on the website, and defendants themselves have admitted that this is an understood term in the industry. It's in the LSA, and they have also admitted that plaintiffs didn't get what they signed up for. Defendants weren't running the model anymore. You know, I'm not sophisticated in the grocery business, but it strikes me that whether or not one is a hard-discounting grocery business is an observable characteristic by entering into the stores and looking at what they're merchandising, what the turnover is, what the pricing is, right? I mean, because, you know, within the industry, a hard discount is like kind of the, well, the epitome of it is like Aldi, right? Then you walk in there, and you look at it, and you say, well, they don't have any branding or very little branding. They have a constantly changing over inventory, and the prices are less than what you find somewhere else. Now, why isn't that something that your clients couldn't have observed simply by shopping the stores that existed? Well, Your Honor, the hard-discount grocer representation is more than that, and I think if you look at defendants' representation, there are arguments in this case. They're saying, look, we were calling ourselves a hard-discount grocer, and so number one, in a renaissance leasing, because there is a specific representation, we're allowed to rely on that. Second of all, we didn't have, our clients didn't have the sophistication to know whether this was a hard-discount grocer or not. We were new to the grocery business. We were relying on, they were trusting Sable Lot to tell them what they were doing. But you did your own due diligence as well, right? Of course, yes. But there's nothing in the record that we learned that this was not a hard-discount grocer, that they were charging excessive bona fide wholesale. Counsel, you mentioned renaissance leasing, and it is the main case in Missouri, on Missouri law. And it says flatly, in terms of reliance, a party who undertakes, I'm quoting, a party who undertakes an independent investigation does not have the right to rely on misrepresentations of another. And you know about Allen's inquiries. You know about models that your clients used. You know about the different meetings that you had. Does that part of renaissance leasing on reliance, does that doom your claim? No, because all of those disclaimers that they are talking about, Your Honor, none of them relate to any of the representations that we're talking about here. Yeah, but I'm talking about an investigation. Well, we didn't. A party that has an independent investigation. I won't read you the law again. Yeah. Go ahead. Well, renaissance leasing specifically says, look, if you do a partial investigation, and you rely on the misrepresentations, that's a valid way to rely on the representations. And there's nothing in the record that indicates that during our investigation, we discovered that any of these representations that we talk about here were false. Well, often independent investigations, when you have the best auditors and the best everything you can get, you don't find out anything, but everybody would say, my goodness, you brought so many experts and looked at this so many ways. Isn't that what renaissance leasing is trying to say? I don't believe so, Your Honor. Not at all. In fact, renaissance leasing. The word is independent investigation, not the kind of words I think you're using. Do you want to tell me what you think the Missouri Supreme Court meant by the terms independent investigation? Well, whether you did an independent investigation I don't think is the inquiry. The inquiry is – Counsel, I quoted you the Missouri Supreme Court. So independent investigation I think is pretty important. There are three different exceptions that renaissance leasing talks about. Whether you do the partial investigation, whether the other side is superior knowledge, right, and whether there's facts outside of your knowledge or there's a specific representation made. This is the specific representation. And so if your investigation doesn't uncover the truth, right, then you're entitled to rely on it. And the scope of your investigation and what your investigation should have discovered are all jury questions. But even if you believe that hard discount grocery is not a representation that's actionable, we still have the other four representations, such as the store failure rate, the bona fide wholesale prices, the proven business model, and then there's the omission, right, the omission that defendants were secretly engaging in what they all believed was this turnaround that was going to take years to execute, was going to cause significant disruption to the stores, and was more likely to fail than succeed. They knew that plaintiffs were investing – and other mom-and-pop organizations throughout the country – were investing a million dollars, approximately a million dollars per store, and they didn't know anything about this dramatic, risky turnaround plan that defendants were planning to do, at the very least, Your Honor. But even if you don't think that on this discovery record that summary judgment should have been denied, it was certainly error for the district court to grant summary judgment without allowing plaintiffs to complete their discovery, right? There was no discovery from Sal when the central question before the court was whether Sal fraudulently induced plaintiffs into these transaction documents. They allowed defendants to decide on their own what documents they were going to produce in violation of Rule 34b-2c, and there was no discovery post-January 3, 2018. So even if you think that on this evidentiary record – and we have shown why the evidentiary record shows that summary judgment should be denied – but even if you think summary judgment was not properly denied on this record, we should have been allowed additional discovery to do that. Third, with respect to the substantive merits of the claims, obviously it was wrong for the district court to grant summary judgment on the merits of the claims when defendants did not even move for summary judgment on the merits. And this district court emphasized and re-emphasized that the case did not reach full merits discovery. I'm assuming that my time for rebuttal is coming close. We rest on all of the arguments that we sent forth in the brief and before, and for these reasons we ask that the district court – or this court – vacate summary judgment for defendants, and I will reserve the rest of my time for rebuttal. And you may. Mr. Simmons. Thank you, Your Honor. It's important to differentiate between Onyx and Sabolat and between the different facts and what happened at different times. The plaintiffs try to conflate all that. Judge Ross's opinion did a very good job of unpacking it. Now let's remember, this is a purported RICO case. But as this court noted in the Craig Outdoor Advertising case in 2008, in Stonebridge in 2015, and reiterated just last week in the UMB Bank v. Garin case, the court has rejected attempts to convert ordinary civil disputes, including what the court called ordinary commercial fraud, into RICO cases. And yet the plaintiffs here concede, quote, this is an individual commercial dispute. That's the first line of their brief. So unless their attempt to convert that commercial dispute into a RICO claim is viable, there isn't even federal subject matter jurisdiction over the ancillary state law claims. And frankly, the problems that doom their RICO claims are equally fatal to their state law claims. So look, as a threshold matter, the plaintiffs don't allege that the Onyx defendants, my clients, made any false statements to them. Let's pause there. That's important. No statements by my clients to them. The entire theory of the case is that Save-A-Lot supposedly made misstatements. We'll come back in a minute to whether those statements amount to indictable offenses of mail-or-wire fraud. And that Onyx, as the majority investor in Save-A-Lot, is responsible for conducting the affairs of Save-A-Lot as a supposed RICO enterprise. So let's get an easy one out of the way. Plaintiffs opened three of their ten stores and were contractually bound to open a fourth before Onyx even invested in Save-A-Lot. So there's no viable claim against Onyx as to those four stores as a matter of law because no supposed fraudulent inducement occurred during Onyx's ownership. It preceded our involvement. Next, they don't claim that even Save-A-Lot said anything new or different after Onyx invested than it had said before Onyx invested. The most they say is that Save-A-Lot repeated or failed to correct earlier pre-Onyx statements and that Onyx should be responsible for not forcing Save-A-Lot to correct those earlier claim misstatements. So let's take apart those claim misstatements. Mr. Calabro just went through some of them. And whether any of them is an independently indictable offense of mail-or-wire fraud is required under 18 U.S.C. 1961 in the definition of racketeering activity. And we can start with the website statements. Each of the claimed website statements was present on the website, as Mr. Calabro just conceded, before Onyx invested. There's no evidence on the record that Onyx reviewed or approved them even after it invested. The only evidence was from Onyx's Matt Ross, who testified that he didn't remember even looking at the website and is not aware of anyone ever having raised the question of whether it was accurate or inaccurate. So aside from the lack of evidence linking Onyx to anything on the website, what did the website say? There was the 40 years of consecutive growth, the proven business model, and the hard discount pricing claim. Are any of those indictable acts of wire fraud? No. As the district court properly found, those are vague promotional statements. Do you want to address the Omnicare case, the Omnicare United States Supreme Court case of 2015? Sure. There were plenty of opinions here, right? I mean, one of the reasons that these statements are not actionable, as Mr. Calabro said, is that they are generalized statements, right? They're generalized corporate puffery. They're generalized statements of opinion. We think we have great prospects. We think that, you know, our licensees can do well. None of that stuff is actionable. This court's decision in City of Plantation Pension Fund in 2021 deals with this issue of corporate puffery. It is, I mean, I know, Your Honor, you're prone to ask what's your best case. I would tell you that is our best case here because it applies to all these generalized statements, whether it's the proven business model claim, the 40 years of consecutive growth claim, or the hard discount, all of which are very vague generalities. 40 years is a closer call, wouldn't you admit? I mean, that's not generalized. That's quite specific, isn't it? Right, except we cited at page 28 of our brief several cases rejecting claims based on very similar language about unquantified growth, including the Meyer case out of Chicago that the district court relied upon. Now, Meyer concluded that claims of positive returns for every client for every year since 1998, that's the quote from that case, was not actionable, was too vague because it wasn't tied to specific metrics, and the court tossed the claim because it was divorced from concrete metrics. But perhaps the easiest way to know that the statement about 40 years of growth can't be actionable is because the plaintiffs themselves conceded they had no idea what it meant. I asked Jim Allen, their president and 30B6 witness, about it in his deposition, and he said he couldn't tell me if it meant growth in the number of stores or growth in same-store sales or growth in overall sales for licensees. The record support for that cited at page 29 for our brief. So if the plaintiffs didn't know what it meant, and when asked as the corporate representative, what did it mean? I'm not sure. It could have been any of those things. They couldn't have been misled by it, and they couldn't have relied upon it. They didn't understand it because it is, as Mr. Colabo used the phrase, a generalized statement. And look, Save-A-Lot had been growing. I mean, they had close to 1,300 stores across the country. They'd had licensees for years. They'd been in operation for decades. But on the question of were they talking about store count or revenue growth or profitability growth or growth if you looked at same-store sales, each of which could be consistent with 40 years of growth, they didn't know. So they were not misled by something that they acknowledged was too general to understand. Proven business model, same way. The plantation itself dealt with the phrase implementing proven strategies, which the court said was a paradigmatic example of the kind of vague and optimistic rhetoric that constitutes corporate puffery. So hard discount pricing. Again, that's puffery. And the plaintiffs themselves offered only the vaguest of attempts to define it. They said, well, lower prices than conventional retail stores using lean operations and a narrow selection of high-volume items. Judge Erickson, as you said, it wouldn't have been hard for them to develop evidence of what did you actually charge. They operated 10 of these stores. They know what they were charged. They should have some benchmarks. Okay, you charged us X dollars for Y product. Everyone else got it for something else. Zero evidence. We cited at page 31 of our brief cases from multiple courts all over the country, including the Fourth Circuit, rejecting similar claims for fraud on similar statements, at least two of which involved grocery store chains, just like Save-A-Lot. The touted comments in those cases included extra low prices, high quality, cost competitive, substantial savings, low competitive rates, exceptional value, lowest prices anywhere. No different than hard discount pricing. Each of them was thrown out as not stating a claim for fraud. And the plaintiffs' arguments here about hard discount fare no better. So what else do they claim? Well, store failure rates. They say that Save-A-Lot, not Onyx, Save-A-Lot told them the store failure rate was 3 to 4 percent. But those statements, if made at all, were by their own admission made in 2014 and 2015, which was long before Onyx invested in Save-A-Lot. It's in paragraphs 108 to 113 of their complaint, appendix pages 405 to 406. Very clear, those were made in 14 and 15, and Onyx didn't invest until the very end of 2016. So Onyx is not responsible for those statements. Plus, as the district court found, when you look at the underlying data, and Judge Ross had the underlying data in front of him, the data supports numbers in the low single digits. It's pages 42 to 43 of the addendum, pages 22 to 23 of Docket 128, which contradicts Plaintiff's unsubstantiated assertion that the failure rate was something more like 20 percent. Bonafide wholesale pricing. Now, first of all, the question of what price they were charged is, if anything, a breach of contract case against Save-A-Lot, not a reco case against Onyx. Second, the debate about what the right price for paper towels and tuna fish should not be a reco claim. That was part of the court's admonition in Stonebridge and Craig not to turn ordinary commercial disputes into reco cases. And third, there's simply no evidence that Save-A-Lot charged anything other than bonafide wholesale pricing, much less that Onyx directed Save-A-Lot to do so. And, of course, since this is a reco case, they have to show that we forced Save-A-Lot to operate as a reco enterprise conducting a pattern of fraud. They offered no evidence, which, as Judge Erickson said, would have been, on the face of it, fairly easy. Counsel, what about your friend's allegation that the district court granted summary judgment on the merits in the absence of a motion to do so? The district court allowed substantial discovery. And if you go back historically, we started out with a straightforward 12B6 9B motion to dismiss, and we referred to their contracts. The district court decided to give them the benefit of the doubt since we were referring to the contracts, even though we think the contracts were fairly included in the complaint, and said, I'm going to convert it to summary judgment. I'm going to give you the chance to take discovery. Limited discovery, the court said. But that, quote, unquote, limited discovery actually turned out to be very broad. And they went back, and the judge ordered us to give more discovery. Then they went back again, and that's when the judge said, no, you've had enough. We've produced 40,000, 50,000 pages worth of material, more. Email reviews, file documents, documents that included not just Onyx's own files, but because Onyx had materials from its own diligence of its investment in Save-A-Lot, because Onyx had directors on the board and got Save-A-Lot board materials quarter by quarter. It included all kinds of granular financial data from Save-A-Lot. So was the argument that you won so clearly that there was no motion required? No, Your Honor. The argument is that the complaint didn't meet 9B12B6 standards to begin with. That was where we started. The argument is that even after they had a chance to take fairly extensive, quote, unquote, limited discovery, there was no evidence to support their claims or their defenses against the releases and waivers. Because on the undisputed facts of all the stuff that happened before Onyx got there, as a matter of law, we can't be liable for that. On the undisputed facts about the nature of the commercial relationship, we can't be liable for that as a matter of law. On the undisputed facts about their diligence, as the Renaissance case said, as Judge Benton pointed out, we can't be liable for that. You know, I understand all that, but I still am a little bit hung up on the discovery management here. And the reason I'm hung up on it is this, is that, you know, the judge on his own converts a 12B6 motion into a summary judgment motion. Not the first time that's done. The judge grants limited discovery. Not the first time that's done. Then they go through, and there's a lot of documents produced. There are admittedly documents that were not produced. No privilege log was produced, so nobody knew what was privileged, what was claimed privileged, what was claimed a trade secret. And so we don't know what's going on there. And then there was no further, you know, the number of depositions was extremely limited. So it became a document case, right? And I think that what SBFO was arguing is that, you know, you turned it into a document case. You didn't give us all the documents. You didn't give us privilege logs so we couldn't even tell what documents were still out there that we could fight about. And in the end, the judge rules, and we didn't get to ask follow-up questions on the depositions where we could have at least discovered what else might be there. You know, right? And so that, you know, it just doesn't look to me like a case involving this many dollars, this kind of size, these kind of law firms, that it was really as fully discovered as I might ordinarily expect. But then again, I might have just had a very different practice as a trial judge. Right, and Judge Ross is obviously very experienced at managing cases. He is too, yeah. He's had it for a very long time. But maybe the easiest way to answer your question, Judge, is to take a look at what they said in response to the renewed motion for summary judgment in the 56 F declaration, docket 107. What do they say they still needed? And the answer is not much. They said they needed documents about the extent of the negotiations. Well, they were the negotiating party. They had those documents. It's within their own knowledge. Whether the plaintiffs had a choice to reject the terms. Well, their 30B6 witness testified, because I asked him this. He said, yeah, sure, we could have walked away at any time. In fact, there were several sites that they looked at they did walk away from. So that was not something in need of further discovery. And indeed, again, they know whether they had a choice, and they have their documents. The party's sophistication and bargaining power. Well, there was record evidence of that. And here's a good one. They needed discovery on whether any other licensee ever successfully sued Save-A-Lot for breach of a license agreement and what remedies it was awarded. Now, A, that's public information. If it's a lawsuit, B, it's irrelevant. And then finally, and I see my time is up, paragraph 16 of that 56-X declaration concluded that plaintiffs believe they have sufficient evidence to defeat summary judgment. But if the court disagrees and wants to grant summary judgment, then we'd like more discovery. They had a fulsome record, Your Honor. And with that, unless there's any other question, I will... Seeing none, thank you for your argument. Mr. Calabro, we're back to you. Thank you, Your Honor. I went back and looked at the renaissance leasing case just because I'm not sure I heard the full quote from Your Honor. But that quote does say a party who undertakes an independent investigation does not have the right to rely on the misrepresentations of another. And in the very paragraph, it then goes on to talk about the exceptions. And we're saying here these are the exceptions, right? We talk about how the investigating party makes only a partial investigation and relies on both the results of the inspection and the misrepresentation. The buyer lacks equal footing for learning the truth. And the seller makes a specific and distinct misrepresentation. Either one of those exceptions would be sufficient. And here we have all three of them. There's nothing in the record that indicates that we actually learned the truth behind any of these five misrepresentations. And most importantly, there's no way we could have learned about the omission. That as we were barreling into these stores, when we were investing millions of dollars into these stores, secretly, Onyx was planning a massive change to the business that they knew was going to take years to execute, that they knew was going to cause substantial disruption to the stores, and that they knew had a less than 50% chance of succeeding. The idea that we were saddled with hidden risks is absurd. Now, I want to go back to some of the things that Mr. Simmons discussed. Yes, ordinary civil disputes are not RICO claims. Of course, we all know that. Has the Supreme Court said that? Now, this Court has said that. Has the Supreme Court said that? The Supreme Court has absolutely not said that. Well, how close have they come to saying it? They have, in fact, said multiple times that we have repeatedly refused to limit RICO. Of course, it applies in the garden variety case. You look at the Sedema case. You look at the Bridge case. RICO is much broader than common law fraud, and it couldn't be clearer. Now, I think some of these previous cases that this Court has said that for is what they're saying, look, if there's no pattern, if there's no enterprise, of course you can't then take a regular garden variety commercial dispute and then convert it into a RICO case because you don't meet the elements of RICO. That's not a surprise. But here, when the elements are met, you have a claim, and RICO is to be read broadly, and particularly with respect to private rights of action, as the Supreme Court noted in Sedema. Counsel, assuming we agree with you on the merits, you ask us to take Judge Ross off the case. We rarely do that. Yes. I don't see any basis in your brief for that other than that you disagree with the holdings below. Well, Your Honor, I understand that that is a very rare case, and we understand that you don't do that lightly. But when we have a judge who says that his mind is made up, no further discovery is necessary, he's granted this weird discovery procedural posture that Judge Erickson mentioned, and he just goes against controlling law. You know, my clients are having a real hard time believing they're getting a fair shake here. Now, I leave it to the Court to decide whether we've met the standard, but if the standard as we wrote it in Toomey is, would a reasonable person knowing the facts of this case have a reason to question whether they're getting a fair shake? Does everything you've mentioned arise from the context of this case? Yes. Thank you. So another point that Mr. Simmons made was that there were no statements by ONIX. But again, that's not the inquiry. First of all, remember, we haven't had discovery on the merits, and the sole focus of the summary judgment motion was supposed to be whether Sal fraudulently induced plaintiffs into the transaction documents. So with respect to this summary judgment motion, that's what we were focusing on. Second, there is liability for ONIX, even if they didn't make the statements. First of all, we have the omission that we talked about. Second of all, we have the conspirator liability and the aiding and abetting liability. It's also just not true that there's no evidence that ONIX knew about the Save-A-Lot representations. We quote in pages, I believe, 60 and 61 in our brief, I believe, don't hold me to that, but we cite the evidence about how ONIX worked with Save-A-Lot to drive folks to the website, particularly new owner-operators, because they needed the money, right? They wanted these owner-operators' cash. I see that my time is running out here, but with respect to the bona fide wholesale prices, of course this is a RICO scheme. This court has regularly, not this court, but this court has the custom hair case where we talked about fraudulent billing, and then we cite several cases on pages 60 to 61 of the reply brief where we cite other district courts in this circuit that also find that fraudulent billing is a RICO game. There is a pattern here. As we set forth in the brief, this fraudulent scheme to bring in additional owner-operators has been going on for years. It has defrauded hundreds, perhaps, of investors and out of several million dollars, hundreds of millions of dollars, perhaps. I see that my time is elapsing. My clients are simply asking for a fair opportunity to go to trial, and for those reasons we ask that the district court's summary judgment be vacated. Thank you, counsel. Thank both counsel for their arguments. Case number 23-1786 is submitted for decision by the court.